IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VIOLA E. MARCKS,                        )
                                        )
            Plaintiff,                  )      Civil No. 06-411-JO
                                        )
      v.                                )      OPINION AND ORDER
                                        )
COMMISSIONER, SOCIAL SECURITY           )
ADMINISTRATION,                         )
                                        )
            Defendant.                  )

        Linda S. Ziskin
        Attorney at Law
        3 Monroe Parkway, Suite P
        Lake Oswego, OR  97035

         Attorney for Plaintiff

        David M. Blume
        SOCIAL SECURITY ADMINISTRATION
        701 Fifth Avenue
        Suite 2900, M/S 901
        Seattle, WA  98104-7075

Neil J. Evans
UNITED STATES ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

Attorneys for Defendant

JONES, Judge:

Plaintiff Viola E. Marcks brings this action pursuant to the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of the Social Security Administration

(Commissioner) denying her request for disability insurance benefits ("DIB") and Supplemental

Security Income ("SSI") disability benefits under Title XVI of the Act. See 42 U.S.C. §§ 423,

1614(a)(3)(A). Plaintiff met the nondisability requirements for a period of disability and DIB set

forth in 42 U.S.C. § 416(i), and was insured for benefits through March 31, 2004. After carefully

reviewing the record, I conclude that this case must be reversed and remanded for further

proceedings under sentence four of 42 U.S.C. § 405(g).[1]

## ADMINISTRATIVE HISTORY

Plaintiff protectively filed an application for DIB in May of 1999, and a concurrent

application in August of 2000. Tr. 21. After both applications were denied initially and on

reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id.

---

[1]In Shalala v. Shaefer, the Supreme Court held that the fourth and sixth sentences of
42 U.S.C. § 405(g) set forth the "exclusive methods" for remanding a case to the Commissioner.
509 U.S. 292, 296 (1993) (citing Melkonyan v. Sullivan, 501 U.S. 89, 99-100 (1991)); see also
Akopyan v. Barnhart, 296 F.3d 852, 854 (9th Cir. 2002) (citing Shaefer, 509 U.S. at 296). A
"sentence four" remand is a final judgment on the merits, so that the district court relinquishes
jurisdiction over the case. See Forney v. Apfel, 524 U.S. 266, 269 (1998) (citations omitted)
(holding that judgment following a "sentence four" remand is final and appealable); and see
Akopyan, 296 F.3d at 854 (citing Shaefer, 509 U.S. at 297).

The ALJ determined that the August 2000 applications, supporting documents and evidence had been combined and irreparably commingled with plaintiff's current claim file, and because it could not be determined precisely which evidence was considered in denying the August 2000 applications, and to avoid undue prejudice, the August 2000 applications were fully considered. Id. The ALJ considered plaintiff's disability status after October 26, 1999, the date of the final determination on the 1999 application. Id. Evidence referenced prior to this date is solely for the purpose of providing perspective on the claimant's current impairments and for the purpose of addressing credibility. Id.

The ALJ held a hearing on March 10, 2004, at which he took testimony from plaintiff, who was represented by counsel, plaintiff's mother, plaintiff's roommate, a medical expert ("ME"), and a vocational expert ("VE"). Tr. 660-721. On October 15, 2004, the ALJ issued an opinion finding plaintiff not disabled as defined in the Act because she could work as a house cleaner or garment sorter. Tr. 17-29. The Appeals Council denied plaintiff's request for review of the ALJ's decision on January 24, 2006, making the ALJ's decision the final decision of the Commissioner. Tr. 9-11; 20 C.F.R. §§ 404.981, 416.1481.

## STANDARD OF REVIEW

This court must affirm the Commissioner's decision if it is based on the correct legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." Martinez v. Heckler, 807 F.2d

3 - OPINION AND ORDER

771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld if it is a rational

interpretation of the evidence, even if there are other possible rational interpretations.

Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989); Andrews, 53 F.3d at 1039-40.

## SUMMARY OF THE ALJ'S FINDINGS

The ALJ employed a five-step sequential evaluation in evaluating plaintiff's disability, as

required. See 20 C.F.R. §§ 404.1520, 416.920. The claimant has the initial burden of proof in

steps one through four of the analysis. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

Then, if the claimant establishes that she is unable to continue her past work, the burden shifts to

the Commissioner in step five to show that the claimant can perform other substantial gainful

activity in jobs existing in significant numbers in the national economy. See id. (citing Swenson

v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)); Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir.

1999).

At the first step, the ALJ determined that plaintiff has not engaged in substantial gainful

work activity since the alleged onset of her disability. Tr. 28. Second, the ALJ found that

plaintiff suffered from the following severe impairments: borderline intellectual functioning;

attention deficit hyperactivity disorder; depressive disorder, not otherwise specified; post

traumatic stress disorder ("PTSD"); panic disorder; and personality disorder with dependent

features. Id. Third, the ALJ determined that plaintiff's impairments did not meet or equal the

requirements of any impairment in the Listing of Impairments found at 20 C.F.R. part 404, app.

1, subpt. P. Id. The findings at steps one through three are not in dispute.

The ALJ determined that plaintiff's residual functional capacity ("RFC") should have the

following limitations: she is unable to work with the public or around crowds; she should not

4 - OPINION AND ORDER

work in close coordination with coworkers or as part of a team; she has marked limitations following complex instructions; she has moderate limitations following detailed instructions; she is sensitive to unanticipated changes, she would do best with an established routine which is not fast paced in its production demands; and she is limited from independent decision making or goal setting. These findings are in dispute. (Pl.'s Opening Br. (#15) at 18-19).

At the fourth step of the evaluation, the ALJ determined that plaintiff could perform her past relevant work as a cleaner/housekeeper and as a garment sorter. Tr. 28. This finding is in dispute. (Pl.'s Opening Br. at 18-19).

Finally, at the fifth step of the evaluation, the ALJ found that plaintiff can perform other jobs existing in significant numbers in the national economy, including cleaner/housekeeper and garment sorter, whether or not they qualify as "past relevant work." Tr. 19. This finding is in dispute. Accordingly, the ALJ found that plaintiff was not disabled as defined in the Act and denied her application for benefits. Tr. 29.

## STATEMENT OF FACTS

Plaintiff was born on January 1, 1967; she was thirty-four years old on February 1, 2001, the date on which she alleges her condition became disabling. Tr. 21, 37. Plaintiff has a high school education, which she attained through special education classes starting in fifth grade. Tr. 21. Plaintiff's past work includes working as a waitress, cleaner/housekeeper, service station cashier/checker, and garment sorter. Tr. 27. Her last relevant work was at a retirement home from August 16, 2001, until September 15, 2001. Tr. 163.

Plaintiff alleges that she became disabled due to post traumatic stress disorder ("PTSD"), chronic panic disorder without agoraphobia, depression, social anxiety, and "breaking down at all

jobs I have had." Tr. 21. Her daily activities include normal housework, craftwork, television watching, and meal preparation. Tr. 177-78. On occasion, plaintiff leaves the house to do grocery shopping, take walks, or attend social events at the Moose Lodge, but almost always while accompanied by a friend or relative. Tr. 676-77. She reports experiencing anxiety attacks two to three times per week. Tr. 675.

## DISCUSSION

Plaintiff challenges the final decision of the Commissioner on the grounds that the ALJ improperly rejected plaintiff's and lay witness testimony and reports, improperly rejected the opinions of plaintiff's examining doctors and treating sources, and incorrectly assessed plaintiff's RFC. (Pl.'s Opening Br. at 12-20). Plaintiff contends that because improper legal standards were applied and the decision was not supported by substantial evidence, this case should be reversed and plaintiff should be found disabled. (Id. at 20).

### A.    Plaintiff's Credibility

Plaintiff asserts that the ALJ failed to give clear and convincing reasons for his determination that plaintiff's and other lay witnesses' testimony and reports regarding plaintiff's mental capacity lacked credibility, and therefore erred in rejecting the testimony and reports regarding plaintiff's subjective complaints. (Id. at 12-16; 19-20).

The ALJ's determination of credibility is entitled to deference by the appellate courts. Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001). However, the ALJ's determination that a claimant or witness lacks credibility must be based on clear and convincing reasons unless there is affirmative evidence of malingering. Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). In making this determination, the ALJ may consider claimant's reputation for

6 - OPINION AND ORDER

truthfulness, inconsistencies either in testimony or between testimony and conduct, failure to

seek treatment or to follow a prescribed course of treatment, claimant's daily activities,

claimant's work record, and testimony from physicians and third parties concerning the nature,

severity, and effect of the impairment. Light v. Social Security Administration, 119 F.3d 789,

792 (9th Cir. 1997).

In this case, the ALJ's determination that plaintiff was "not entirely credible" was not

based on substantial evidence, and his reasons for rejecting her testimony were erroneous.  The

ALJ acknowledged in his opinion that there was no issue as to whether plaintiff had significant

mental impairments; the real issue was the extent of her functional limitations.  Tr. 23.  Because

of some inconsistencies between medical opinions, plaintiff's credibility was "critical in reaching

a conclusion" regarding her functional capacity.  Id.  The ALJ gave seven reasons why plaintiff's

credibility was lacking:  her reports of social activities, her noncompliance with treatment

programs, her driving records, her reports of certain sexual abuse, her craftwork, her poor work

history, and her passing of a bad check.

The ALJ stated in his opinion that plaintiff's reports of difficulty functioning outside the

home and in social situations are inconsistent with her reports of going out socially with friends.

Tr. 24.  Plaintiff reported to Dr. Balsamo, an examining psychiatrist, on September 28, 2001, that

she goes to garage sales and shops with her mother or grandmother, and goes to bars to play pool

and darts with a few close friends a few times a week.  Tr. 334-35.  In contrast, during a mental

status examination performed by Dr. Truhn on March 29, 2002, plaintiff reported that she had no

friends and only shops at night for short periods of time.  Tr. 420.  The ALJ noted this

inconsistency and concluded that it was evidence of plaintiff's lack of credibility; however, the

ALJ failed to take into consideration that plaintiff moved from Lebanon, Oregon (where she was born and raised) to Florence just two months before Dr. Truhn's examination. Tr. 420. It would reasonably be expected that someone with impairments such as plaintiff's would have a difficult time making friends and establishing social connections in a new area. Additionally, the ALJ failed to consider a report prepared by Dr. Montgomery, a treating psychologist, on March 1, 2002, in which Dr. Montgomery stated that plaintiff exhibited marked impairments in social functioning, due in part to the fact that plaintiff had "become estranged from her family/support system in the past 6 weeks." Tr. 433. Dr. Montgomery further stated that plaintiff had been evicted from her house in Lebanon and was unable to hold a job, which contributed to her anxiety at that time. Id. Therefore, plaintiff was not likely misrepresenting herself in order to obtain benefits when she complained of having no friends–as the ALJ assumed–but was simply explaining to Dr. Truhn her situation in life at that moment.

The ALJ also points to the mere fact that plaintiff goes out in public at all as evidence of her lack of credibility. Although marked inconsistencies between a claimant's reported impairments and daily activities will have a negative bearing on his or her credibility, a claimant should not be penalized for attempting to live a normal life despite limitations. Cooper v. Bowen, 815 F.2d 557 (9th Cir. 1987). By attempting to engage in normal activities outside the home, accompanied by close friends or relatives, plaintiff was trying to achieve some degree of normalcy in her life. It is a normal coping mechanism, as the ME testified, for a person with social anxiety to need a "protector" when venturing out in public. Tr. 709. As Dr. Truhn wrote in his report, the people plaintiff goes out with are either family or close friends with whom she grew up. Tr. 335. Dr. Montgomery stated on March 9, 2004, that plaintiff almost always needed

a protector when leaving the house, and even with her protector along she experienced episodes of decompensation. Tr. 535. At the hearing, plaintiff's roommate testified that plaintiff has only gone out in public without her twice, and when she does go out she often leaves early due to anxiety and panic attacks. Tr. 674, 698. The weight of the evidence shows that although plaintiff attempts to lead a normal life, she needs a close friend or relative when venturing out in public, and even with such support, she frequently experiences anxiety and panic attacks.

The ALJ cited plaintiff's failure to attend multiple scheduled appointments for therapy as evidence of her lack of credibility as "unexplained failure to follow a prescribed course of treatment." Tr. 22. In 1998, plaintiff missed four out of nine of her medication appointments and was told that if she missed another appointment, the provider would need to terminate services with her. Tr. 245-46. Dr. Cindy Wilson, who did not actually have a session with plaintiff, documented that she only attended five of the nine scheduled therapy sessions, canceled or "no showed" for four individual sessions, and "no showed herself out of the Panic Group." Tr. 631. In 2001, plaintiff's file at Linn County Department of Health Services was closed because although plaintiff met with a therapist seven times, she "no showed" for six appointments and did not direct her energy towards treatment. Tr. 367. Yet after plaintiff moved to Florence in January 2002, she stated to Dr. Truhn that she "got tired of the counselors [in Lebanon] and they didn't seem to be helping." Subsequently, plaintiff did not have a problem keeping appointments and attended 32 sessions with Dr. Montgomery between March 2002 and March 2004. Tr. 535.

The ALJ also pointed out that Dr. Balsamo noted inconsistencies and exaggerations in his interaction with plaintiff during a psychological evaluation on September 28, 2001. Dr. Balsamo wrote:

> Ms. Marcks seemed motivated to present herself in a particularly unfavorable light while simultaneously attempting to portray herself as being relatively free of common shortcomings or minor faults. While these results raise the possibility of an exaggeration of complaints, the level of exaggeration is moderate and is frequently interpreted as being a dysfunctional response to stress. Tr. 339.

The ALJ concluded, in reference to the above comments, that "objective testing reveals evidence of moderate exaggeration." Tr. 26. However, what Dr. Balsamo actually stated in his report was that the results of the evaluation raise the possibility of an exaggeration of complaints, and that this possible exaggeration is likely a response to stress. Tr. 339. The most significant results of the clinical scales, according to Dr. Balsamo, were her disruption of thought processes, including difficulties in decision-making, concentration, and memory, at times becoming so severe as to result in confusion and difficulty communicating. Id. The ALJ erred in taking Dr. Balsalmo's comments out of context and interpreting them as evidence of malingering. Instead, he should have evaluated the report as a whole.

In examining plaintiff's prior work history, the ALJ pointed to plaintiff's sparse employment prior to alleging disability and the fact that she never made more than about $4400 in any given year. Tr. 26, 87-88. Poor work history may be considered an adverse credibility factor. Thomas, 278 F.3d at 959. Yet poor work history can in some cases reflect a true impairment. In this case, the evidence shows that plaintiff attempted to work at many jobs, but was unable to maintain steady employment due to panic attacks and breakdowns on the job. Tr. 665-67. The job plaintiff managed to keep the longest (six months) was a waitress job at a

small cafe with only three other employees who were sensitive to plaintiff's impairments.

Tr. 671. This job was terminated following plaintiff's suicide attempt in 1998. Tr. 420.

However, the ALJ attributed her low earnings to a lack of commitment to work rather than a true

impairment. Tr. 26. The ALJ cited no evidence pointing to plaintiff's lack of propensity to work

other than her poor earnings; thus, his interpretation of her work history as having an adverse

bearing on her credibility cannot be upheld by this court.

The ALJ also points to inconsistencies in plaintiff's reports about driving. Tr. 26.

However, on a closer examination of the record, the four inconsistencies that the ALJ highlights

reconcile. In November of 2000, plaintiff had not yet obtained a license; on September 28, 2001,

plaintiff reported long drives in the country (and had presumably gotten her license at this point);

on March 29, 2002, plaintiff reported being frightened while driving and having tunnel vision;

and then on April 11, 2003, Dr. Truhn reported that plaintiff "said she has not driven for year."

Tr. 283, 335, 420, 462. The ALJ interpreted that grammatical error to mean that she has not

driven in "years" but Dr. Truhn's report may have meant to read "a year," which would make

sense, because a little over a year prior, plaintiff reported suffering from tunnel vision and being

frightened while driving. Additionally, plaintiff testified that she no longer drives because her

license was revoked due to of lack of insurance, and because she was afraid to drive. Tr. 679-80.

Taken as a whole, there is not substantial evidence in the record to support a finding that plaintiff

made inconsistent statements concerning her ability to drive. Thus, plaintiff's reports concerning

her driving cannot count as a discrediting factor.

The ALJ found an inconsistency in plaintiff's description of physical abuse and rape by

her in-laws. Tr. 26. He notes that plaintiff alleged abuse and rape by her in-laws multiple times

in the record, but "enhanced" her claim during treatment with Dr. Montgomery, reporting that

she was also forced to watch her ex-husband have sex with his mother on a regular basis. Tr. 26,

506. The ALJ questions plaintiff's credibility because these events were never mentioned at any

other time. However, most of the references to her abuse in the record do not go into detail about

the abuse, and are just general statements that plaintiff discussed sexual and physical abuse.

Tr. 241, 255-56, 284, 431, 433, 461, 488, 499, 501.

There is not substantial evidence in the record to support a finding that plaintiff enhanced

her allegations. The record is sparse on the details of the abuse, so there is no way to know

whether she was lying during her sessions with Dr. Montgomery. Furthermore, plaintiff saw Dr.

Montgomery consistently for over two years and it is logical to assume that a certain level of trust

had built up between them that did not exist between plaintiff and, for example, Dr. Truhn, who

only saw plaintiff twice. Plaintiff most likely felt more comfortable with Dr. Montgomery and

thus gave her a more detailed account of the abuse than she did the other medical professionals.

Accordingly, I conclude that the ALJ erred when he used this piece of evidence to discredit

plaintiff.

The ALJ stated that plaintiff's reports that she did craftwork several hours a day at home

run contrary to any claim that she lacks the mental capacity to work. However, taking into

account plaintiff's alleged disability, home-based craftwork does not conflict with her allegations

of panic disorder, PTSD, and social anxiety. Plaintiff remains at home when she makes the

crafts, and is not under any of the pressure that would be associated with outside employment.

Furthermore, plaintiff does experience difficulty completing her projects. Plaintiff's roommate

testified that plaintiff works for half an hour, then goes on to another project, then moves on to

still more projects without finishing any of them. Tr. 692. The record also shows that craftwork is a form of therapy for plaintiff. Plaintiff stated on more than one occasion that working on crafts calms her down, and her roommate also testified that plaintiff starts sewing or quilting when she has an anxiety attack, and it "relieves" her. Tr. 520, 527, 691. Plaintiff's ability to engage in therapeutic craftwork at home does not easily translate into the ability to do work in an employment context outside the home, and cannot appropriately be considered a discrediting factor.

Finally, the ALJ referred to plaintiff's conviction for purposely writing a check with insufficient funds as a "crime of moral turpitude" and used it as a discrediting factor. Tr. 27. Crimes that involve dishonesty are relevant to the issue of credibility. U.S. v. Leyva, 659 F.2d 118, 121-122 (9th Cir. 1981). Yet taking into account the totality of the circumstances, the fact that plaintiff bounced a check has little bearing on her credibility. She exhibited candor when asked about the bad check and explained that she had expected her cousin to place money in her bank account to avoid bouncing the check, but her cousin failed to do so. Tr. 681. Additionally, Dr. Montgomery attributed plaintiff's passing the bad check to the "self-sabotaging" behavior associated with her personality disorder and borderline intellectual functioning. Tr. 429. When she was charged for writing the bad checks, plaintiff was able to take responsibility for her behavior and further explained that she was concerned with homelessness at the time. Tr. 523.

After fully and fairly considering all of the evidence regarding plaintiff's testimony, her medical records, and her activities, I am compelled to conclude that the ALJ's credibility findings and interpretation of the record are not supported by substantial evidence. The reasons the ALJ gave do not meet the clear and convincing standard required to support his decision to discredit

13 - OPINION AND ORDER

plaintiff's testimony. See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). Since the ALJ

failed to provide legally sufficient reasons for rejecting plaintiff's testimony, this court will take

it as true as a matter of law. Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004).

### B.   Medical Opinions

The ALJ stated in his opinion that "there is no issue that the claimant has significant

mental impairments." Tr. 23. The contested issue was the extent of plaintiff's functional

limitations, and in attempting to resolve conflicting testimony regarding plaintiff's ability to

function, the ALJ rejected much of the medical opinion in the record. He rejected the opinions of

Dr. Truhn (examining physician) and Dr. Montgomery (treating psychologist). Tr. 22-23. The

ALJ also rejected the opinions of two nurse practitioners who worked with Dr. Montgomery.

Tr. 23. He gave great weight, however, to the ME's opinion at the hearing. Tr. 24-26.

When conflict exists, greater weight is given to a treating physician's opinion over the

opinion of a nontreating physician because a treating physician "is employed to cure and has a

greater opportunity to know and observe the patient as an individual." Sprague v. Bowen, 812

F.2d 1226, 1230 (9th Cir. 1987). An ALJ must at a minimum give specific and legitimate

reasons, supported by substantial evidence in the record, for rejecting the treating physician's

opinion. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). When a treating physician's opinion

is contradicted, and the opinion of a nontreating source is based on independent clinical findings

that differ from those of the treating physician, the opinion of the nontreating source may itself be

substantial evidence; it is the ALJ's duty to resolve that conflict. Magallanes v. Bowen, 881 F.2d

747, 751 (9th Cir. 1989).

The ALJ rejected Dr. Montgomery's opinion because although she has a Ph.D. in psychology and practices as part of a group (Options Counseling Services of Oregon), she is not licensed to practice psychology in Oregon and cannot be considered an "acceptable medical source." Tr. 23. He likewise rejected the opinions of nurses Karen Lomax and Kenneth Zimmerman, because they are not considered "acceptable medical sources" under Social Security Ruling ("SSR") 06-3p, and because Lomax's involvement in plaintiff's treatment is unclear. Id. Here, the ALJ committed clear error. He stated in his opinion that "nurse practitioners are not acceptable sources for the purpose of offering opinions regarding functional limitations." It is true that "non-acceptable" medical sources may not alone establish an impairment. SSR 06-3p. Yet evidence from sources which are not "acceptable medical sources" may (and should) be used to establish "the severity of the individual's impairment(s) and how it *affects the individual's ability to function*." Id. These "other sources" include but are not limited to nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. Id. This definition would necessarily include Dr. Montgomery and the nurse practitioners treating plaintiff. Therefore, the ALJ erred in rejecting the opinions of Dr. Montgomery, Ms. Lomax, and Mr. Zimmerman on the basis that they were not "acceptable medical sources."

Dr. Truhn's opinion largely corroborates Dr. Montgomery's opinion regarding her diagnoses of post-traumatic stress disorder, chronic; panic disorder with agoraphobia; dysthymic disorder; generalized anxiety disorder; and personality disorder, not otherwise specified, with dependent features. Since Dr. Truhn's opinion is uncontradicted by other evidence in the record, the ALJ must provide clear and convincing reasons for rejecting it. The ALJ pointed to an

inconsistency between the GAF scores in the record and Dr. Truhn's statements regarding plaintiff's ability to function. Tr. 23. In particular, the ALJ stated that although Dr. Truhn assigned an improved GAF score after the second examination, he identified "a significant decline in the claimant's ability to function" during the second examination. Id. Dr. Truhn examined plaintiff on March 29, 2002, and April 11, 2003. Tr. 417, 460. On March 29th, Dr. Truhn reported that plaintiff had poor social skills and difficulties with attention, concentration, short and long-term memory, as well as common sense reasoning and problem solving. Tr. 417, 423. He noted marked restrictions in concentration, persistence, or pace, many brief episodes of decompensation, and likely decompensation with a minimal increase in mental demands or change in the environment. Tr. 424-25. He assigned her a GAF score of 38 and stated that her prognosis was poor. Tr. 422-23.

On April 11th of the next year, Dr. Truhn reported that plaintiff had marked limitations dealing with detailed instructions, maintaining concentration and attention, working with others, and completing a normal workday/week. Tr. 467-69. However, Dr. Truhn also noted that plaintiff had been going to therapy with Dr. Montgomery for nearly a year and had demonstrated improvement with the use of therapy. Tr. 464. Dr. Truhn reported that plaintiff's involvement with volunteer work was a positive way to increase her coping strategies without the pressure of a work environment. Tr. 465. He assigned her a GAF score of 55 and stated that her prognosis was fair. Tr. 464-65.

The court is unable to discern the purported inconsistency the ALJ points to as reason to reject Dr. Truhn's opinion. As made evident by the two reports, plaintiff's functioning improved slightly during the year between the examinations, likely due to psychotherapy. This

16 - OPINION AND ORDER

improvement in functioning resulted in an elevated GAF score and prognosis in the second

report.  Although markedly better than a GAF score of 38, a score of 55 is still indicative of

moderate symptoms (*e.g.*, flat affect and circumstantial speech, frequent panic attacks) or

moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with

peers or co-workers).  See American Psychiatric Association, Diagnostic and Statistical Manual

of Mental Disorders, 34 (4th ed. 2000).  Dr. Truhn specifically stated in his report that plaintiff

was still unable to cope with the pressures of a competitive work environment, but might benefit

from vocational rehabilitation services in developing her abilities; this assessment is consistent

with a GAF score of 55.  Tr. 465.  Therefore, the ALJ improperly rejected Dr. Truhn's opinion.

### C.    Lay Witness Evidence

Plaintiff asserts that the ALJ improperly rejected the testimony of lay witnesses Helen

Groomberg and Kendra Burnett.  (Pl.'s Opening Brief at 19).  In determining whether a claimant

qualifies for benefits, the ALJ must consider "all relevant evidence," including non-medical

evidence.  20 C.F.R. §§ 404.1526; 416.913(d)(4).  Descriptions by family members and friends

who are in a position to observe the claimant's symptoms and daily activities are treated as

competent evidence.  Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  The ALJ must

articulate "germane reasons" for discrediting lay witness testimony; that is, the ALJ must make a

showing that the lay witness testimony directly conflicts with medical evidence on the record.

Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (citing Lewis v. Apfel, 236 F.3d 503,

511 (9th Cir. 2001)).  Improperly rejected lay witness testimony is grounds for reversal and must

be given full credit as true upon review.  Schneider v. Commissioner of Social Sec. Admin., 223

F.3d 968, 976 (9th Cir. 2000).

The ALJ in this case reasoned that the testimony given by Groomberg and Burnett did not match that of two other lay witnesses who completed standardized forms describing plaintiff's mental capacity. Tr. 27. David Coe, plaintiff's boyfriend, and Dawn Keffer, plaintiff's cousin, filled out disability reports on plaintiff's behalf. Tr. 171, 194. In Coe's report, prepared November 17, 2001, he stated that plaintiff did not take offense easily, that she left home often to visit friends and family, and that she went to bars, sewed, and did household chores. Tr. 172-73, 176. He also stated that there were no social activities she could no longer do, and that although she experienced anxiety attacks, medication helped keep them under control. Tr. 172-73, 176, 180. According to Keffer's report, prepared April 4, 2002, plaintiff often left home, but only when accompanied. Keffer noted that plaintiff could not deal with people very well, but did socialize with her friends and would not have problems getting along with coworkers. Tr. 204. Both witnesses stated that plaintiff's mental impairments interfere with her ability to work on a regular basis. Tr. 181, 204.

Ms. Groomberg, plaintiff's mother, testified that she had witnessed plaintiff's breakdown at the cannery where they worked together and that plaintiff had other similar breakdowns in work and social settings. Tr. 685-86. Ms. Burnett, plaintiff's roommate, testified that she had witnessed plaintiff's frequent anxiety attacks at home, and that plaintiff experiences such attacks once or twice a week. Tr. 688. She also testified that plaintiff experiences occasional panic attacks when attending Moose Lodge functions. Tr. 689. In the time that she had known plaintiff, Ms. Burnett stated, plaintiff had left home only twice without her. She also testified, regarding plaintiff's craft hobby, that plaintiff could not stay on task for more than half an hour at

a time, and that she was constantly starting one thing and going on to another without first finishing the first project. Tr. 692.

The ALJ acknowledged that this testimony would support a finding of disability, but rejected it because it was inconsistent with the reports prepared by Coe and Keffer. Tr. 27. The only reasonable interpretation of this lack of corroboration, the ALJ reasoned, was that Coe and Keffer failed to observe the level of symptoms and limitations that plaintiff alleges. Id. The ALJ essentially found that the third party statements cancelled out the lay witness testimony, stating that "these reports and testimony do little to further the merit of the claimant's application." Id. Yet the ALJ failed to take into consideration the fact that third party statements do not constitute sworn testimony, while lay witness testimony constitutes important evidence that should not be arbitrarily disregarded. Disregarding lay witness evidence violates the Commissioner's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work. 20 C.F.R. §§ 404.1513(e)(2); 416.926. However, such disregard of third party reports has not been held to be reversible error. See Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984); see also Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). Furthermore, the witnesses at the hearing provided more detailed, firsthand, insight into plaintiff's anxiety attacks and social functioning. The hearing provided a forum where the witnesses could be questioned under oath, whereas the third party reports were unsworn, lacked detail, and were confined to the form provided. The ALJ's duty is to resolve conflicting testimony, and in doing so in this case he should have taken into account the above distinctions and accorded greater weight to the testimony given at the hearing.

D.    **Residual Functional Capacity**

Plaintiff argues that the ALJ failed to include key facts in the hypothetical presented to the VE at the hearing. The hypothetical posed to the VE must set forth all of the limitations and restrictions of the particular claimant. Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). Plaintiff's last full-scale I.Q. test equaled 76, and she was diagnosed by Dr. Balsamo and Dr. Truhn with borderline intellectual functioning. Tr. 339, 422. The ALJ acknowledged these facts, and found that plaintiff's borderline intellectual functioning was a severe impairment. However, the ALJ failed to include this limitation in the hypothetical questions posed to the vocational expert. The ALJ's hypothetical involved a 37-year-old woman with a high school education, who is unable to work around the public, crowds, in close circumstances with co-workers, or as part of a team, has marked limitations following complex instructions and moderate limitations following detailed instructions, is unable to keep up with fast-paced production demands, and has limited goal-setting or decision-making capabilities. Tr. 715-16. Absent was any mention of plaintiff's borderline intellectual functioning, which had been established by substantial evidence in the record, including multiple IQ tests and functional assessments. Based on this hypothetical, the VE determined that plaintiff was able to perform her past work as a garment sorter and as a cleaner/housekeeper. Tr. 716. Nevertheless, when the VE's answer to the ALJ's hypothetical fails to reflect the limitations that claimant has established by substantial evidence, the answer has no evidentiary value. Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984); see also Paden v. Barnhart, 92 Fed. Appx. 465, 468 (9th Cir. 2004) (unpublished), available at 2004 WL 376657. Therefore, since the VE's answer to the hypothetical was based on the ALJ's erroneous

omission of an established impairment, it cannot constitute substantial evidence sufficient to
support the ALJ's RFC determination and ultimate disability findings.

### E.    **Scope of the Remand**

The decision whether to remand for further proceedings or to award benefits is within the
court's discretion.  See Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987); see also Ramirez v.
Shalala, 8 F.3d 1449, 1455 (9th Cir. 1993).  The Ninth Circuit has articulated standards by which
this court is to decide whether to remand for further proceedings or simply for an award of
benefits.  A case should be remanded for an award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such
> evidence, (2) there are no outstanding issues that must be resolved before a
> determination of disability can be made, and (3) it is clear from the record that the
> ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d at 1292; see also Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).

In this case, a remand for an award of benefits is inappropriate because there are still
outstanding issues with regard to plaintiff's functional capacity which must be resolved.  Without
some sort of medical opinion as to the functional limitations reasonably expected to result from
plaintiff's established impairments, some consideration of the possible additional impairments
discussed above, as well as an evaluation of the lay testimony in this case, any attempts by this
court to reach a conclusion as to the ultimate issue of disability would be speculative at best.
Accordingly, a remand for further proceedings to develop the record and reconsider the disability
analysis is appropriate.  See Benecke, 379 F.3d at 593.

Thus, I conclude that a remand for an immediate award of benefits is not appropriate
because outstanding issues remain to be resolved and it is not clear from the record that the ALJ

would be required to find that plaintiff is disabled.  Consequently, in the exercise of my

discretion, I remand this action to the Commissioner for further proceedings.  See 42 U.S.C.

§ 405(g) (sentence four).

## **CONCLUSION**

For the reasons set forth above, the Commissioner's decision is REVERSED and this

matter is REMANDED to the Commissioner for further proceedings consistent with this opinion,

including a full and fair consideration of the improperly rejected testimony and medical evidence,

and an analysis of the effect plaintiff's borderline intellectual functioning has on her residual

functional capacity.

DATED this ___4th___ day of September, 2007.

_____

ROBERT E. JONES
U.S. District Judge.